[Civ. No. 17220.   Second Dist., Div. Three.   Nov. 4, 1949.]

EDWARD SATCHELL et al., Petitioners, v. INDUSTRIAL
ACCIDENT   COMMISSION,   CLARA   LANCASTER
et al., Respondents.

Kearney, McCartney, Scott & Clopton for Petitioners.

T. Groezinger, Robert Ball and Frank W. Troost for Respondents.

SHINN, P. J.—Review of an award of burial expenses and death benefit payable to Clara Lancaster, widow of Alex Lancaster. The question for decision is whether there was substantial evidence to justify the finding of the Industrial Accident Commission that the injury sustained by Alex Lancaster arose out of and occurred in the course of his employment. He was a spotter for Washington Cleaners and Dyers, a partnership composed of Edward Satchell, James Henry Satchell and Edward Henry Satchell, Jr. In the afternoon of December 24, 1947, Mr. Lancaster, while at his place of employment, drank carbon tetrachloride from a bottle which he evidently believed contained whiskey. Five days later he died from the effects of the poison.

The record in this matter is lengthy. Our labor has been greatly increased by the deficiencies of the practice that is followed in these review proceedings. It is not customary to have the evidence transcribed unless a writ is issued. The statement of the evidence by the petitioner, which is wholly inadequate in the instant proceeding, and that of the respondents, having been prepared before a transcript was available, and not being supplemented in any manner thereafter, have no transcript references. Important items of evidence disclosed by reading the entire transcript of the evidence have been overlooked by the parties.

The Satchells had some 45 employees, among whom were five or more spotters. Lancaster had been in their employ for six years. The employers gave a Christmas party at the plant for which they provided food and drinks, including a case of whiskey, procured by Edward Satchell, which was entirely consumed during the course of the party. While all the direct and positive evidence was that this party was given on the evening of December 20th it is argued by respondents that there was substantial evidence it was held on the 24th and that we must assume the referee so decided. It is not seriously contended by petitioners that the death would not have been compensable if the fatal drink had been taken at the employers' party. It is strenuously argued, however, that any drinking which took place on another occasion would not have arisen out of or in the course of the employment. After

a careful study of the record and mature consideration of the questions we are unable to agree with either contention.

A police officer testified that about December 30th Edward Satchell, who was the head of the firm, told him that the employers' party was given the afternoon of December 24th. A daughter of decedent testified that on the evening of the 24th her father, who had returned home about 4 p. m. and was suffering great distress, told her there had been a party and that he had drunk carbon tetrachloride. Evidence of Satchell's alleged statement, although contradicted by strong and positive testimony of interested and disinterested witnesses, would no doubt be sufficient to support a finding, had one been made, that the party was held on the 24th. No such finding was made and upon the record it cannot be supplied by implication. ■ The rule that it will be presumed by a reviewing court that the trier of facts made all determinations of fact, and that all findings should be implied which are necessary to support the judgment or order, and which would find support in the evidence, has limitations which a reviewing court cannot conscientiously ignore. If the record clearly shows that the trier of facts declared that a state of facts entering into his decision had or had not been established by the evidence, it would be an absurd reliance upon a fiction, and a grave injustice, for a reviewing court to imply a finding in support of the judgment or order contrary to such oral declaration. It is clear from the record that the referee in the instant proceeding gave credit to the testimony of the witnesses who swore that the employers' party was given the afternoon of December 20th. He did not find that the fatal drinking took place during a party given by the employers. He stated in his report: "It is the opinion of the undersigned that there probably was a party of some sort on December 24, 1947; *that while the so called Christmas party may have been on Saturday before Christmas Eve (December 20th) there was also drinking on the day before Christmas.* (Emphasis added.) Furthermore, after hearing the witnesses and observing them it is my opinion that the employers had no objections to such drinking on Christmas Eve. It is, therefore, my conclusion that the decedent employee met his death as the result of an injury arising out of and occurring in the course of his employment."

We shall therefore assume that no employers' party was given on the 24th. It is true that there was evidence that

Edward Satchell was generally opposed to drinking on the premises. He testified that he had orally so informed his employees, although Alex Lancaster, Jr., an employee, testified that he had never been so informed. It was the practice for the spotters to play cards Friday afternoons, but to remain on the premises in order to perfect their work if the inspectors found it needed further attention. There was testimony that there was usually a good bit of drinking during these card games. Alex Lancaster drank some every day, although not to excess. Edward Satchell testified that he warned Lancaster against drinking "maybe several a times a week." Other spotters bought whiskey from time to time, consumed it on the premises, but usually concealed their bottles in a trough outside the building and threw empty ones in an ashcan of a neighboring business. There was evidence that on the afternoon of December 24th a card game was in progress in which Edward Satchell participated. There was no evidence that the players were drinking during the course of the game. The morning of the 24th Alex Lancaster had received a present of a bottle of whiskey and had consumed it. Tom Satchell, a relative and employee of the partners, was drinking and saw Lancaster drinking.

Among the cleaning agents used were amyl acetate and carbon tetrachloride. Sam Messler, a friend of the Satchells, from whom they had purchased hangers, came to the plant the afternoon of the 24th. He had spots of paint on his clothing. He asked Edward Satchell for cleaning fluid. Satchell told Lancaster to give him carbon tetrachloride, which Messler could take home with him. Lancaster went outside, got a brown whiskey bottle, went to one of the large cans that cleaning fluid was kept in, filled the bottle, told Messler it was not "the right thing for it," put the bottle on a board behind where he worked, had Messler take off his jacket, cleaned it, and then told Messler he should use amyl acetate for paint spots. Edward Satchell asked Messler if Lancaster had given him what he wanted and Messler replied that Lancaster had told him that the contents of the bottle was not for paint spots, and he asked Satchell to have a bottle of amyl acetate for him the next time he came in. Several days later a small colored bottle was found where Lancaster had worked. There was doubt as to its contents and it was thrown away. A police officer testified that after the death of Lancaster he inspected the premises, was shown about by Edward Satchell and observed flat whiskey bottles containing cleaning fluid. Alex

Lancaster, Jr., testified that whiskey bottles were used for that purpose. There was also testimony that cleaning agents were sometimes kept in brown whiskey bottles, and unlabeled brown bottles similar to whiskey bottles; that one reason for the practice was that some of the cleaning fluids deteriorated if kept in clear glass bottles.

Two questions are presented: (1) Was it a question of fact for decision by the commission whether whiskey drinking on the day before Christmas was reasonably contemplated by the terms and conditions of Lancaster's employment. (2) Was there sufficient evidence to justify the commission's affirmative answer to the first question.

The first question is clearly one of fact. So far as the drinking of whiskey was concerned the practices followed in the plant were somewhat unique. It will become obvious that our discussion is related to an unusual state of facts. Since moderate drinking was tolerated it must have been considered that the efficiency of the workmen would not thereby be seriously impaired. The Friday afternoon card games and drinking, indulged in during a recess in the work of the spotters was a recognized and customary practice. Although it appears that Edward Satchell was opposed to drinking by the employees, and there was testimony that two employees had previously been discharged for drinking, moderate drinking, nevertheless, went on without any effective steps being taken to prevent it. The fact that the employers gave a Christmas party on the 20th instead of the 24th was merely one of many circumstances to be considered by the commission. The fact that the party was held on the 20th did not foreclose the holding of some sort of a party by the employees on the 24th, nor did it mean that there would be no drinking on the 24th, especially during the slack period when the usual card game was going on. The question for the commission to decide would have been altogether different if the employers' Christmas party had been the only occasion when drinking took place with the express or implied consent of the employer, or if there had been no evidence of the peculiar business practice of keeping cleaning fluids in whiskey bottles. All the circumstances we have related had to be weighed by the commission in determining whether the drinking that took place on December 24th was in the course of practices which were customary with the particular class of employees to which Lancaster belonged. It is clear that the

commission could properly find that the drinking of whiskey under the circumstances related was to be anticipated under the conditions of Lancaster's employment. The decision was therefore one of fact.

It is too well settled to admit of question that an injury is compensable if the employee is at the time engaged in doing something he might reasonably have been expected to do while in the performance of his duty. (*Leffert* v. *Industrial Acc. Com.*, 219 Cal. 710 [28 P.2d 911]; *Pacific Indem. Co.* v. *Industrial Acc. Com.*, 26 Cal.2d 509, 513 [159 P.2d 625]; *Lockheed Aircraft Corp.* v. *Industrial Acc. Com.*, 28 Cal.2d 756 [172 P.2d 1]; *Elliott* v. *Industrial Acc. Com.*, 21 Cal.2d 281 [131 P.2d 521, 144 A.L.R. 358].)

Particularly appropriate to the instant case are the remarks found in the opinion of the District Court of Appeal, adopted by the Supreme Court in *Whiting-Mead Com. Co.* v. *Industrial Acc. Com.*, 178 Cal. 505 [173 P. 1105, 5 A.L.R. 1518], with respect to whether smoking in the course of certain employment was necessarily contemplated. The court said: ''The petitioner, in answering these questions in the negative, places great dependence in the argument that tobacco is used to appease a self-created appetite and not a natural appetite. The argument does not appeal to us. In an endeavor to determine what indulgence of human beings are responsive to the demands of natural, what to unnatural, appetites, we should be carried to the depths of biological and physiological research. Such labor is not necessary. We have the tobacco habit with us and must deal with it as it is. It will not do to say that mankind would be better for a lack of the weed, even if that statement be true. Tobacco is universally recognized to be a solace to him who uses it, and it may be that such a one, unless he finally shakes off the habit, cannot perform the labors of his life as well without it as with it.'' An injury to the employee, Duarte, occasioned by his smoking was held to be compensable. It was to be anticipated that Duarte would smoke while he worked. The facts of the present case justify the same conclusion with respect to Lancaster's drinking. As previously stated, the testimony was that he drank some every day. He had worked for the Satchells for six years; Edward Satchell's testimony that he reminded Lancaster of the rule against drinking ''maybe three times a week'' was rather convincing evidence that he knew of Lancaster's drinking, warned him against it, knew that his warnings were ineffectual, and yet preferred to keep him, despite his drink-

ing, rather than get along without him. It may be conceded that Edward Satchell was opposed to the drinking but it could also be inferred that his protests to Lancaster were so feeble as to lead the latter to believe they were expressed as advice and not as an attempted enforcement of a rule against drinking. Under the circumstances we cannot hold, as a matter of law, that the drinking of whiskey by Lancaster during working hours was not well known to his employers and tolerated by them. It should not be understood that this would be deemed a sufficient reason for affirming the award. This is no mere case of a workman's having sustained injury through drinking while at work, with the implied consent of his employer. It is the concurrence of all the conditions we have discussed that persuades us that under the peculiar facts of the case the injury could reasonably be held to have arisen out of and to have occurred in the course of the employment.

There is, of course, a proximate relationship between Lancaster's drinking the fatal dose and the practice in the plant of keeping poisonous fluids in whiskey bottles and similar bottles, for the use of the spotters in the course of their work. It may not be doubted that this business practice was peculiarly hazardous to an employee who was accustomed to drinking whiskey from bottles. There was ample evidence to justify the findings and conclusions of the commission.

The award is affirmed.

Wood, J., and Vallée, J., concurred.